## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **JERRY COOLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO. CV-03-PT-2502-E** |
| | ) | |
| **CITY OF ANNISTON, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

-------------------------------------------------------

| | | |
|---|---|---|
| **JERRY COOLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO. CV-04-PT-2588-E** |
| | ) | |
| **CITY OF ANNISTON, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This cause comes on to be heard upon defendants John Dryden, Scott Garrison, Shed
Dobbin, Phillip Smith, and Ken McElroy's (collectively "Anniston defendants") Motion for
Summary Judgment, filed on April 17, 2005, and defendant Chuck Battles' Motion for Summary
Judgment filed on April 20, 2005.

### FACTS AND PROCEDURAL HISTORY

Defendants Phillip Smith ("Smith"), Shed Dobbin ("Dobbin"), Scott Garrison
("Garrison"), and Ken McElroy ("McElroy") are officers under the direct control and supervision
of Police Chief John Dryden ("Dryden") and the Anniston Police Department.  Defendant Chuck

1

Battles ("Battles") is not an employee of the City, but is a law enforcement officer employed by

the District Attorney for the Seventh Judicial Circuit of Alabama, and assigned to the

Calhoun/Cleburne County Drug & Violent Crime Task Force ("Task Force").

An Alabama Uniform Arrest Form and affidavits submitted by defendants relate the

following facts.  On August 29, 2002, at approximately 2:45 p.m., Battles and Smith were riding

in an unmarked vehicle behind a blue, four-door Chevrolet bearing Georgia license tag 592 YJJ.

Plaintiff Jerry Cooley ("Cooley"), who was the driver of the Chevrolet, was not wearing a seat

belt.  Smith and Battles followed the Chevrolet for several blocks waiting for the registration

information to be given to them over the radio.  At the intersection of 21st Street and McElroy

Avenue, Smith activated the vehicles' blue lights to initiate a traffic stop.  Cooley failed to stop.

Cooley continued east on 21st Street.  Approximately two blocks later, just prior to reaching

Noble Street, Smith activated his siren.  Cooley turned north on Noble Street and continued

north.  Battles testified that, at this point, he notified the Anniston Police Department of the

situation and requested assistance.  Smith pulled his car alongside the Chevrolet, and Battles got

Cooley's attention, telling him to pull over.  According to Battles, Cooley acknowledged the

officers but just smirked and continued driving north on Noble Street.  At the intersection of Blue

Mountain Road, approximately 11 blocks after Cooley turned onto Noble Street, Dobbin, in a

marked Anniston Police Department vehicle, pulled behind Cooley with his emergency lights

activated.  Cooley pulled into a parking lot.

Battles and Smith then approached Cooley's vehicle and opened his door.  Battles

testified that he pulled up his shirt to reveal his badge, which was clipped to his belt, and

identified himself as a member of the Drug Task Force.  According to Battles and Smith, Battles

2

asked Cooley why he did not stop his car earlier, and Cooley said: "Y'all ain't the police."  Smith told Cooley that he was under arrest for interfering with a police officer.  Battles ordered Cooley to get out of the vehicle, but Cooley did not comply.

Smith and Battles then removed Cooley from the vehicle, and attempted to wrestle him to the ground.  Smith and Battles ordered Cooley to place his hands behind his back and to stop resisting arrest.  However, Cooley refused to submit to being handcuffed.  Cooley attempted to break loose from the officer's grasp by pulling his arms away from their hands.  When Smith and Battles finally got Cooley on the ground, Cooley used both hands to try to push himself off the ground.  According to Battles, he and Smith continued to order Cooley to stop resisting.

Because of Cooley's continued resistance, Battles applied a lateral vascular neck restraint. This is a technique used to subdue a combative arrestee without striking any blows.  Battles testified that, in his judgment, a lateral vascular neck restraint was the minimum force necessary to subdue Cooley so that he and Smith could complete the arrest.  After Battles applied the neck restraint, he, Smith, and recently-arrived officers Garrison and McElroy pulled Cooley's hands behind his back and handcuffed him.  According to Battles, the arrest was completed without striking any blows to Cooley.

Cooley testified to a different version of events.  According to Cooley, he saw the flashing lights and heard the siren coming from the undercover police vehicle.  However, Cooley stated, he did not pull over because he did not think they were police lights or sirens.  Cooley asserted that the light and siren appeared to him to be produced by equipment available to the general public which he had seen at car shows.  Cooley also admitted that he saw Battles hanging out of the passenger-side window and yelling at him to pull over.  Cooley testified that he did not

pull over because he did not believe that Battles and Smith were police officers.  Cooley claims

that, when he saw Dobbin's police vehicle with its lights flashing, he pulled over at the next

available location.

Cooley maintains that Battles and Smith came over to his vehicle, pulled his door open,

and asked him why he did not stop.  According to Cooley, he told the officers that he didn't

know who they were, and that they could have been trying to "car jack" him.[1]  Cooley claims that

Smith or Battles said "well, I'm fixing to show you getting jacked," and pulled him out of the

car.  Cooley asserts that, at this point, he told Dobbin "you see what they are doing to me," but

Dobbin did and said nothing.  Then, according to Cooley, Smith or Battles swept his feet out

from under him, he fell to his knees, he was knocked flat on the ground, and he was put in a

choke-hold.  Cooley asserted in his deposition that Smith, and not Battles, was the one to put him

in a choke-hold.  Cooley testified that he was held in the choke-hold for a long period of time

without Smith or Battles trying to put handcuffs on him.  According to his deposition testimony,

Cooly blacked out and regained consciousness at this time.  Cooley stated that, when he realized

the officers were not trying to handcuff him, he began to believe they were trying to kill him.

After this point, Cooley began to struggle, tried to get up, and began gasping for air.  Soon

thereafter he was handcuffed.

Both McElroy and Garrison testified that they arrived on the scene at the point where

Battles and Smith were already on the ground struggling to subdue Cooley.  They testified that

Cooley appeared to be resisting arrest.  According to them, they only assisted in putting Cooley's

---

[1] Cooley admits that after he was pulled over by the marked police car, he realized that
Smith and Battles must also have been law enforcement officers.

4

hands behind his back and handcuffing him.  On the other hand, Cooley testified that "more

cops", presumably McElroy and Garrison, did not arrive until after he was handcuffed.  Cooley

stated as follows:

> Q:   Okay.  Let's go back to the arrest.  I think that's as far as we had gotten before we started talking about injuries.  You had been placed in handcuffs, and you were sitting on the ground.  What happened after you were placed in handcuffs and sitting on the ground?
>
> A:   After a while, there was more cops on the scene.  More cops was coming to the scene.
>
> Q:   Okay.  What did they do?
>
> A:   I was still on the ground.  And eventually after the cops that came there, they put me in one of the black and white cars.

Defendants have produced excerpts from the Anniston Police Department's Standard

Operating Procedures, which state in part:

> **Unnecessary Force:** Member shall not use unnecessary force or violence in making an arrest or in dealing with a prisoner or any person.  Members shall not strike or use any other form of physical force on a prisoner or other person except when necessary to prevent violence to another person.  However, he must be firm, resolute and energetic, exercising the necessary means to properly perform his duty.
>
> **Degree of Force To Be Used In Making An Arrest:** In making an arrest, an officer must be careful not to submit his prisoner to any greater severity or indignity than is necessary to effect the arrest and bring the prisoner safely to the police building for booking.
>
> The statutes require the officer to do his duty at all hazards, but in the performance of his duty they require him to be as considerate as circumstances will permit.  The officer must remember that he is responsible for his prisoner and is required to do what is necessary to secure him.  The officer must use his own good discretion, and if he does his duty in a consistent, careful and prudent manner, he will be justified.  While the officer is required to be as gentle and considerate in making an arrest as circumstances will permit, he must also remember that he is a representative of the law, to whose lawful demands all must submit.  The officer is charged with the duty and armed with the power to compel such submission.

> **Report To Be Made On Any Force Used:** Whenever it is necessary to use any unusual physical force or other means, said member shall report same as soon as possible to his commanding officer, and a written report to the chief of police, though channels, relating all circumstances, shall be included with the arrest report on the case.  Should he have to use physical force, or other means to overcome actual physical resistance, he will, on approval of his commanding officer, also charge the subject with interfering with an officer and/or assault, as the case may be.

 Smith and Garrison testified that they did not deviate from these written procedures at the time of Cooley's arrest.

Battles testified that, after the struggle, Cooley had minor abrasions and scratches due to his thrashing around on the parking lot.  According to Battles, Smith asked Cooley if he had any injuries, and Cooley replied that his knees were scraped up.  Battles stated that, when Smith asked Cooley if he needed any medical attention, Cooley said no.  However, Cooley testified that he suffered a variety of injuries from the incident, including abrasions on his arms and legs, a bloody noise, and hemorrhages in his eyes.  Garrison testified that he transported Cooley to the Drug Task Force Office for booking.  According to Garrison, Cooly did not complain to him of any injuries.  Garrison also did not notice any injuries on Cooley.

Battles testified that, the day after his arrest, Cooley came to the Drug Task Force office and complained of injuries, including abrasions and scratches and an injury to his left eye.  Battles had observed Cooley's minor abrasions and scratches at the time of his arrest.  However, Battles testified that he did not observe any injury to Cooley's left eye at the time of the arrest.

After the incident, Cooley was charged with: (1) interfering with a police officer in violation of Anniston Code § 24.23; (2) resisting arrest in violation of Ala. Code § 13A-10-41; and (3) driving without a seat belt in violation of Ala. Code § 32-5B-4.

On August 30, 2002, Smith filed two criminal complaints against Cooley in Anniston Municipal Court.  In case number MC-02-2182, Cooley was charged with interfering with a police officer.  In case number MC-02-2183, Cooley was charged with resisting arrest.  On December 11, 2002, the City prosecutor nolle prosed the charges.  On April 23, 2003, Smith filed two complaints against Cooley in Calhoun County District Court.  In case number DC-03-2280, Cooley was charged with resisting arrest.  In case number DC-03-2281, Cooley was charged with failing to wear a seat belt.  On September 9, 2003, the State nolle prosed the charges in District Court so that they could be reinstated and pursued in Municipal Court.  On the next day, September 10, 2003, the charges in Municipal Court were reinstated.  On August 23, 2004, the Municipal Court dismissed the charges against Cooley.

Cooley explained in his deposition that he is not complaining about anything that Battles did in his prosecution.  He stated:

> Q:      What are you complaining about that Chuck Battles did in the prosecution?
> A:      In the courts?
> Q:      Yes.
> A:      Or on the scene?
> Q:      In the courts.
> A:      In the courts, nothing that I know inside of the courts.
> Q:      So your only complaint with him is regarding the arrest?
> A:      Yes, on the scene of the arrest.
> Q:      On the scene of the arrest.
> A:      Yes.

On September 10, 2003, Cooley, filed action CV-03-2502-E against the City of Anniston and Battles.  Also named as defendants in the Complaint were "other [law enforcement] officers X, Y, Z (whose [n]ames will be added when [a]scertained.)"  Cooley's Complaint in this first action contains four counts.  In Count One, Cooley alleges that Battles and the unnamed law

7

enforcement officers inflicted "excessive force" against him during the August 29, 2002 arrest in violation of the U.S. Constitution and Alabama law.  Cooley also asserts that the officers' conduct was undertaken "while acting in the line and scope of [their] employment with the City of Anniston, and due to the negligence of the City of Anniston in hiring, training or retraining or [supervising the officers]."  Cooley further states that the officers' conduct was "pursuant to an official policy of the City of Anniston, or pursuant to a custom or practice endorsed or approved by the City of Anniston."

In Count Two, Cooley alleges that Battles and the Anniston officers falsely arrested him and caused his "malicious prosecution" thereafter in violation of the U.S. Constitution and Alabama law.  Additionally, Count Two asserts that Cooley's damages were caused while the officers were "acting in the line and scope of [their] employment with the City, . . . and [were] due to the negligence of the City . . . in hiring, training or retraining" them.

Cooley claims in Counts Three and Four that Battles, the Anniston officers, and the City violated his: (1) "rights to life, liberty and the pursuit of happiness guaranteed by the First Amendment;" (2) "rights to a fair trial and trial by jury as required under the [F]ifth, [S]ixth, [E]ighth and [F]ourteenth Amentment[s];" (3) "rights to be free from excessive force and of cruel and unusual punishment as guaranteed by the [E]ighth Amendment;" and (4) "right to be free from double jeopardy."

On October 3, 2003, this Court entered a Scheduling Order, which required that any amendments to the claims or parties be made on or before November 17, 2003, and that discovery be completed before February 9, 2004.  According to the Anniston defendants, Cooley did not conduct any discovery and did not attempt to amend his complaint prior to the deadlines.

8

Battles and the City of Anniston filed Motions for Summary Judgment on or before

January 7, 2004.  Regarding those Motions, this court entered an Order and Memorandum

Opinion on March 10, 2004.  In that Order, this court dismissed all of Cooley's claims against

the City of Anniston, with prejudice.  Pertaining to Cooley's claims against Battles, the Order

stated:

> (1) To the extent that any excessive force claim purports to be based on any constitutional or statutory provision other than the Fourth Amendment, the Fourteenth Amendment, and § 1983, such claim is **dismissed, with prejudice**.
> (2) Any purported § 1981 claim is **dismissed, with prejudice**.
> (3) Any purported First Amendment claim is **dismissed, with prejudice**.
> (4) Any purported claim based upon "right to a fair trial and trial by jury under the Fifth, Sixth, Eighth, and/or Fourteenth Amendments," or otherwise, is **dismissed, with prejudice**.
> (5) Any purported double jeopardy claim is **dismissed, with prejudice**.
> (6) Any Eighth Amendment claim is **dismissed, with prejudice**.
> (7) Any federal and/or state malicious prosecution claim is **dismissed, without prejudice**, as being premature.
> (8) The application for injunction is **dismissed**.
>
> Any other claims against defendant Battles are stayed pending disposition of the criminal trial and deposition of plaintiff.

Cooley appealed this Order to the Eleventh Circuit on or about April 8, 2004.  The

Eleventh Circuit dismissed the appeal on August 10, 2003.  Regarding this court's denial of

injunctive relief, the Eleventh Circuit dismissed because of Cooley's failure to prosecute the

appeal by paying the requisite court costs.  Pertaining to the Cooley's claims for damages, the

Eleventh Circuit dismissed for lack of jurisdiction because there had not been a final judgment.

On August 27, 2004, Cooley brought a second action (CV-04-2588-E) in this court,

naming the following defendants: the City of Anniston, Dryden, Battles, Garrison, Dobbin,

Smith, McElroy, and the State of Alabama.  In this new action, Cooley also named as defendants

"A.B,C" (*sic*) and "E,F,G."  According to the Complaint in this second case, "A.B,C" is meant to designate the "individual, entity, corporation, [or] person, who or which deprived the Plaintiff of his civil rights."  "E,F,G" is intended to designate the "individual, entity, corporation, [or] person who or which conspired to deprive the plaintiff of his civil rights."  The Complaint in the second suit alleges that defendants Dobbin, McElroy, and Garrison are police officers for the City of Anniston.  The Complaint further asserts that defendant Smith, like Battles, is a member of the Calhoun County unit of the Alabama Drug Task Force.  The facts alleged in the second Complaint are much the same as those pertaining to the first suit, with the causes of action allegedly arising from the August 29, 2002 traffic stop and subsequent events.  According to the Complaint, the second action "arises under the Constitution of the United States and its Amendments 1st, 6th, and 14 . . . [and] 42 U.S.C. titles 1981, 1983, 1985, 1988 et seq."  Count One of the second Complaint charges:

> Defendant Chief John Dryden and Defendant City while acting under color of state law unlawfully deprived the Plaintiff, of Plaintiff's legal rights guaranteed to him by the Constitution and Laws of the United States in that [they] failed and or refused to train Defendant Officers and Defendant Agents.

Count Two states in part:

> Plaintiff avers that on or about August 29, 2004 (*sic*) Defendant Agents Smith and Battles under color of state law conspired and traveled in disguise on a public highway for the purpose of depriving the plaintiff of equal protection of the laws and equal privileges and immunities under the law of the United States and the State of Alabama.

> Plaintiff avers that as a proximate result of the action of the Defendant Agents the Plaintiff was deprived of his rights guaranteed by the Constitution of the United States and the State of Alabama and was injured, bruised, abraised and lacerated.

Count Three of the second Complaint alleges:

> Plaintiff avers that Officer Shed Dobbin acting in his capacity of Police Officer for the Defendant City of Anniston, Unlawfully deprived and or conspired to deprive the Plaintiff of his legal rights guaranteed him by the Constitution of (*sic*) United States, State of Alabama and Federal Law by standing idly and failing to protect Plaintiff and watching the assault of the plaintiff by defendant Agents Smith and Battles.

Cooley alleges in Count Four of the second Complaint:

> Plaintiff avers that Officers Scott Garrison and Ken [McElroy] acting in their capacity of Police Officers for the Defendant City of Anniston, unlawfully deprived and or conspired to deprive the plaintiff of his legal rights guaranteed him by the Constitution of (*sic*) United States, State of Alabama and federal law by assisting in his unlawful arrest and failing to protect plaintiff by watching the assault of the plaintiff by defendant Agents Smith and Battles and failing and/or refusing to do anything to stop said assault.

Finally, Count Five of the second Complaint asserts:

> Plaintiff avers that City of Anniston, Chief John Dryden, Officer Shed Dobbin, Officer Scott Garrison, Kenny [McElroy] and Agents Battles and Smith conspired under the color of state law to deprive plaintiff of his rights to equal protection and due process of law and the equal privileges and immunities under the laws of the U.S., State of Alabama and City of Anniston by failing and/or refusing to appear for hearing of the Municipal Court of the City. By filing the said action in state court and failing and/or refusing to appear and prosecute the said action in state court by refiling the action in the Municipal Court for the City of Anniston, after the statutes of limitation had run.

The two cases were consolidated by this court on November 22, 2004. On December 29, 2004, in response to a Motion to Dismiss filed by the City of Anniston, this court dismissed with prejudice all claims in both cases against the City. In a Memorandum Opinion filed on that day, this court stated:

> . . . The court . . . conclude[s] . . . that plaintiff's filing of a second cause was simply a back door effort to avoid a principle stated in *Mays v. United States Postal Service,* 122 F.3d 43 (11th Cir. 1997). See page 46, particularly notes 5 and 6. Plaintiff had a full opportunity to address his claims against the City of Anniston in the first filed action without any response pursuant to Federal Rule of Civil Procedure 56(f). Further there was no motion under Federal Rule of Civil

Procedure 59(e). This court cannot allow this method of circumvention. The claim(s) against the City of Anniston will be dismissed with prejudice. The claims asserted against defendants John Dryden, Scott Garrison, Shed Dobbin, Phillip Smith, and Ken McElroy in the second case are not dismissed, but may be addressed through a Motion for Summary Judgment.

On January 27, 2005, the court issued an additional order dismissing with prejudice any and all claims against the State of Alabama.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

12

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS[2]

**I.    Anniston Defendants' Motion.**

**A.    Res Judicata / Claim Preclusion.**

The Anniston Defendants maintain that they are entitled to summary judgment on the claims asserted in case number CV-04-2588-E based on the res judicata affirmative defense. "Res judicata or claim preclusion refers to the preclusive effect of a judgment in foreclosing relitigation of matters that were litigated or could have been litigated in an earlier suit." *I.A. Durbin, Inc. v. Jefferson Nat. Bank,* 793 F.2d 1541, 1549 (11th Cir. 1986). As such, the Anniston defendants assert, res judicata prohibits a plaintiff from bringing claims that were previously litigated as well as some claims that have never been raised. In order for the doctrine of res judicata to bar a subsequent suit, four elements must be present: (1) there must be a final judgment on the merits; (2) the decision must be rendered by a court of competent jurisdiction; (3) the parties, or those in privity with them, must be identical in both suits; and (4) the same

---

[2] This section summarizes the arguments made by the parties and does not necessarily reflect the conclusions reached by the court.

cause of action must be involved in both cases. *Hart v. Yamaha-Parts Distributors, Inc.,* 787

F.2d 1468, 1470 (11th Cir. 1986); *Ray v. Tennessee Valley Authority,* 677 F.2d 818, 821 (11th

Cir. 1982). If these elements are met, the Anniston defendants argue, even unlitigated claims

merge with the prior judgment in the case and are subsequently barred. According to the

Anniston defendants, all the elements are satisfied in this case, and Cooley's second action

should, therefore, be dismissed with prejudice.

> **1.      There Was a "Final Judgment" in Case CV-03-2502-E as That Term
> Is Defined Under the Res Judicata Doctrine.**

The Anniston defendants point out that this court entered Summary Judgment in the

City's favor in Cooley's original suit. Regarding Cooley's claims against the City, this court

stated as follows:

> The claims against the City of Anniston will be dismissed. Battles is not an
> officer or employee of the City of Anniston. Furthermore, there is no substantial
> evidence that any action taken by any party was the result of any custom, practice,
> or policy of the City of Anniston, that the City of Anniston improperly hired or
> trained any employee or officer, or that the City of Anniston was on notice that
> any officer or employee needed further training.

The Anniston defendants maintain that this prior ruling covers all the claims asserted by

Cooley in the second suit; i.e. that the Anniston officers "stood by" and "conspired with" Agent

Battles and the State of Alabama to deprive him of his constitutional rights. The Anniston

defendants acknowledge that Cooley might argue that only a "final judgment" bars a subsequent

lawsuit, and that this element is not met because this court did not certify the Summary Judgment

Order as a final judgment pursuant to Federal Rule of Civil Procedure 54(b). However, the

Anniston defendants argue, "final judgment" means something different under the res judicata

doctrine than it means for purposes of filing an appeal. *See Alexander v. Chicago Park Dist.,*

773 F.2d 850, 855 (7th Cir. 1985) (finding that district court was correct that order was

sufficiently final for res judicata purposes even if not appealable); *Yaba v. Roosevelt,* 961

F.Supp. 611, 622 n.3 (S.D.N.Y. 1997) (stating, *"[f]inality for the purposes of res judicata is not

as strict as the requirements of finality for the purposes of bringing an appeal").*  According to the

Anniston defendants, federal courts have uniformly held that: "[w]hether a judgment, not 'final'

in the sense of 28 U.S.C. § 1291, ought nevertheless be considered 'final' in the sense of

precluding further litigation of the same issue, turns upon such factors as [(1)] the nature of the

decision (i.e., that it was not avowedly tentative), [(2)] the adequacy of the hearing, and [(3)] the

opportunity for review." *Lummus Co. v. Commonwealth Oil Refining Co.,* 297 F.2d 80, 89 (2nd

Cir. 1961).  The Anniston defendants further assert that federal courts have held that "finality" in

the context of res judicata analysis means only that, "the litigation of a particular issue has

reached such a stage that a court sees no really good reason for permitting it to be litigated

again." *Id.*  For this reason, the Anniston defendants contend, federal courts have held that a

court's grant of partial summary judgment does constitute a final judgment for res judicata

purposes. *See Hennessy v. Cement and Concrete Worker's Union Local 18A,* 963 F.Supp. 334,

338-39 & n.1 (S.D.N.Y. 1997) (finding that court's order granting motion for summary

judgment, dismissing complaint, and denying cross- motion for an order of discontinuance was a

final adjudication on the merits for res judicata purposes); *U.S. v. McGann,* 951 F.Supp. 372,

380-82 (E.D.N.Y. 1997) (citing *Lummus Co.* and finding that a grant of partial summary

judgment was sufficiently final to have res judicata effect).  To further support their argument,

the Anniston defendants point to *Sherman v. Jacobson,* 247 F.Supp. 261 (D.C.N.Y. 1965).  In

that case, the court stated:

15

> [Res judicata] is a principle which seeks to bring litigation to an end and promote certainty in legal relations.  The final judgment rule is designed to prevent enfeebling judicial administration which would result from permitting the harassment and cost of a succession of separate appeals from the various rulings to which a litigation may give rise, from its initiation to entry of judgment.  Effectuation of these policies would clearly be hampered if "final" were given the same meaning in each context. A consistently broad interpretation of the term would flood the appellate courts with piecemeal litigation, while a narrow interpretation would allow a litigant to bring an endless number of law suits. It follows, therefore, that "final" for res judicata purposes must be construed in the light of the considerations of that doctrine, rather than be automatically equated with "final" in the final judgment rule.

*Sherman,* 247 F.Supp. At 268 (internal quotations and citations omitted).

Here, the Anniston defendants contend, there is no indication that this court considered its entry of Summary Judgement in favor of the City to be "tentative."  Additionally, the Anniston defendants assert, Cooley had a full opportunity to conduct discovery, amend his pleadings to assert new claims and new defendants, produce evidence, and articulate arguments on the issues presented in his second filed Complaint.  The Anniston defendants maintain that Cooley actually did argue these very same issues to this court in the first case.  Furthermore, the Anniston defendants point out that Cooley will have an opportunity to appeal the decision in favor of the City once the claims against Battles are adjudicated in the original case.  Therefore, the Anniston defendants argue, the Summary Judgment entered by this court was a "final judgment" under the res judicata doctrine because the action has "reached such a state that [there is] no really good reason for permitting it to be litigated again."  *Lummus Co.,* 297 F.2d at 89.

### 2.	The Decision By This Court Was Rendered By a Court of Competent Jurisdiction.

The Anniston defendants point out that, in the original suit, this court had federal question jurisdiction over the § 1983 claims, supplemental jurisdiction over the Alabama state

law claims, and personal jurisdiction over the defendants.  Therefore, the Anniston defendants

maintain, the Summary Judgment decision was rendered by a court of competent jurisdiction, as

required by the res judicata doctrine.

### 3.    The Parties, or Their Privies, Were Identical in Both Suits.

The Anniston defendants argue that the third requirement of res judicata is met because

the City and Cooley are named parties in both cases.  The Anniston defendants acknowledge that

Cooley may argue that this element has not been satisfied because Dryden, Smith, Garrison,

McElroy, and Dobbin were not parties in the original case.  However, according to the Anniston

defendants, such an argument should be rejected because the "same parties or privies" element is

designed to ensure that the party against whom the res judicata defense is asserted has an

adequate opportunity to prosecute all claims.  The defendants argue that an analysis of whether

the individual defendants not sued in the first action had "privies" in that case is really not

pertinent to the res judicata issue.  What is pertinent, they assert, is that Cooley, the party against

whom the res judicata defense is asserted, was a party in the previous case.

According to the Anniston defendants, even if res judicata did require that Dryden, Smith,

Garrison, McElroy, and Dobbin have a privy in the original case, the record shows that the City

would satisfy this requirement.  The defendants argue that whether a party is in privity with

another for purposes of res judicata is a question of fact that is reviewed for clear error.  *See*

*Mesa Petroleum Co. v. Coniglio,* 787 F.2d 1484, 1489-90 (11th Cir. 1986) (citing *Astron*

*Industrial Associates, Inc. v. Chrysler Motors Corp.*, 405 F.2d 958 (5th Cir.1968) and stating,

"[w]hen a case goes to trial, the question of whether a party is virtually representative of the

interest of a non-party is one of fact for the district court); *Astron Indus. Associates, Inc. v.*

*Chrysler Motors Corp.,* 405 F.2d 958, 961 (5th Cir. 1968) (stating, "[the] determination of

identity between litigants for the purpose of establishing privity is a factual question, and the

District Court should not be reversed unless its determination is clearly erroneous").    The

Eleventh Circuit has stated, "'[p]rivity' is a flexible legal term, comprising several different types

of relationships and generally applying when a person, although not a party, has his interests

adequately represented by someone with the same interests who is a party." *E.E.O.C. v. Pemco*

*Aeroplex, Inc.,* 383 F.3d 1280, 1286 (11th Cir. 2004) (citing *Hansberry v. Lee,* 311 U.S. 32, 41-

43 (1940)).  The Anniston defendants assert that adequate representation can arise in a number of

circumstances, such as:

> [(1)] where the nonparty has succeeded to the party's interest in property,
> [(2)]where the nonparty controlled the original suit, [(3)] where the nonparty's
> interests were represented adequately by the party in the original suit [i.e. "virtual
> representation"], and [(4)] where the party and nonparty have concurrent interests
> in the same property right.

*Hart v. Yamaha-Parts Distributors, Inc.,* 787 F.2d 1468, 1472 (11th Cir. 1986).  The Anniston

defendants contend that the "virtual representation" type of privity applies here.  The Eleventh

Circuit has held:

> "Virtual representation" is a term of art that we have defined as applying "when
> the respective interests are closely aligned and the party to the prior litigation
> adequately represented those interests."  The doctrine of virtual representation
> provides in essence that "a person may be bound by a judgment even though not a
> party if one of the parties to the suit is so closely aligned with his interests as to be
> his virtual representative."  Whether a party is a virtual representative of another
> is a question of fact.
>
> We have employed four factors in determining whether there is virtual
> representation: whether there was "participation in the first litigation, apparent
> consent to be bound, apparent tactical maneuvering, [and] close relationships
> between the parties and nonparties."  All of these factors need not be found to
> meet the virtual representation standard, nor is it necessarily enough that one of

18

them is found; rather, we examine them in concert to determine whether there is virtual representation.

*Pemco Aeroplex,* 383 F.3d at 1287 (internal citations and footnotes omitted).

The Anniston defendants argue that, in the original case, the City was clearly aligned with Dryden, Smith, Garrison, McElroy, and Dobbin, and that it adequately represented their interests. According to the defendants, the City defended these individual defendants' actions and showed that they did not commit any constitutional or common law torts. Additionally, the Anniston defendants maintain, this court analyzed whether these individual defendants committed any tortious actions even though they were not party-defendants in the first action. Therefore, they argue, the virtual representation type of privity exists here and the third res judicata requirement is satisfied.

> **4.      The "Same Cause of Action" Was Involved in Both Cases as That Term Is Defined Under the Res Judicata Doctrine.**

The Anniston defendants assert that cases are deemed to be part of the same "cause of action" when they "arise out of the same transaction or series of transactions" even if identical claims are not present in both cases:

> Under the current analysis we make a fact-based inquiry into whether the cases are based on the same factual predicate or came from the same nucleus of operative fact. If they did, they are the "same" for the purposes of res judicata. The doctrine is concerned with the substance, and not the form, of the proceedings. "It is now said, in general, that if a case arises out of the same nucleus of operative fact, or is based upon the same factual predicate, as a former action, that the two cases are really the same 'claim' or 'cause of action' for purposes of res judicata." Thus, we look to the factual issues that must be resolved by the litigation and ask whether those facts arise out of the same transaction or series thereof. In so doing we ask whether the plaintiff could, or rather should, have brought the second claim with the first lawsuit.

*Trustmark Ins. Co. v. ESLU, Inc.,* 299 F.3d 1265, 1270 (11th Cir. 2002) (internal citations

omitted).  The Anniston defendants maintain that res judicata acts as a bar "to all legal theories and claims arising out of the same operative nucleus of fact."  *Pleming v. Universal-Rundle Corp.,* 142 F.3d 1354, 1356-57 (11th 1998) (quoting *Manning v. City of Auburn,* 953 F.2d 1355, 1358-59 (11th Cir. 1992)).  Here, the defendants argue, all the claims asserted by Cooley in the second case arose out of the same nucleus of operative fact as was present in the original action.  Therefore, they assert, all four requirements of res judicata are met here.[3]

**B.      Collateral Estoppel / Issue Preclusion.**

According to the Anniston defendants, issue preclusion or "collateral estoppel" also applies here to bar Cooley's claims in the second action.  Collateral estoppel forecloses relitigation of an issue of fact or law that has been litigated and decided in a prior suit.  *I.A. Durbin, Inc. v. Jefferson Nat. Bank,* 793 F.2d 1541, 1549 (11th Cir. 1986).  The requirements that must be met prior to applying the collateral estoppel doctrine include: (1) the issue at stake must be identical to the one involved in the prior litigation; (2) the issue must have been actually litigated in the prior action; (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that earlier action; and (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding.  *Greenblatt v. Drexel Burnham Lambert, Inc.*, 763 F.2d 1352, 1360 (11th Cir. 1985).

**1.      The Issues in the Plaintiff's Second Case Are Identical to Those Involved in Case CV-03-2502-E.**

---

[3] The Anniston defendants acknowledge that the malicious prosecution claim that the court dismissed without prejudice in the original action is, arguably, not subject to res judicata, collateral estoppel, and the prior pending action doctrine.  However, the defendants maintain that this claim fails as a matter of proof.  *See infra.*

20

According to the Anniston defendants, the issues critical to Cooley's claims in the second action are whether the Anniston officers involved with Cooley's arrest (1) acted properly and (2) were properly trained.  Both issues, the defendants maintain, were examined by this court in the original action.  Therefore, they assert, the first requirement of collateral estoppel is satisfied.

2.    The Issues at Stake in the Plaintiff's Second Case Were "Actually Litigated" in Case CV-03-2502-E as That Term Is Defined Under the Collateral Estoppel Doctrine.

"When an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated."  *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1359 (11th Cir. 1998) (quoting Restatement (Second) of Judgments § 27 cmt. d (1982)).  The Anniston defendants assert that the issue of whether they acted properly and were properly trained was actually litigated in the original action.  Furthermore, they argue, "[i]t is widely recognized that the finality requirement is less stringent for issue preclusion than for claim preclusion."  *Christo v. Padgett,* 223 F.3d 1324, 1339 (11th Cir. 2000).  In the Eleventh Circuit, "for purposes of issue preclusion . . . , 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect."  *Id.* at 1339 n.47.  According to the Anniston defendants, because the finality requirement is met for purposes of res judicata, it is certainly met with regards to collateral estoppel.

3.    The Determination of the Issues at Stake in the Plaintiff's Second Case Were a Critical and Necessary Part of the Judgment in Case CV-03-2502-E.

The Anniston defendants argue that this court had to determine whether they acted properly and whether they were properly trained in order for it to conclude that the City was not responsible under § 1983 or Alabama common law.  Therefore, the defendants maintain that the

21

third requirement of collateral estoppel has been satisfied here.

    **4.    Plaintiff Had a Full and Fair Opportunity to Litigate the Issues at Stake in the Second Case in Case CV-03-2502-E.**

    The Eleventh Circuit has stated, "[c]ollateral estoppel bars relitigation of a previously decided issue when the parties are the same (or in privity) if the party against whom the issue was decided had a full and fair opportunity to litigate the issue in the earlier proceeding." *In re Southeast Banking Corp.*, 69 F.3d 1539, 1552 (11th Cir. 1995) (citing *Allen v. McCurry*, 449 U.S. 90, 95 (1980)). The Anniston defendants argue that for the same reasons articulated in the res judicata discussion above, the same parties and/or their privies are involved in both cases. Furthermore, the defendants assert, because the issues were decided on a Motion for Summary Judgment in the original case, Cooley had a "full and fair" opportunity to litigate his claims on the merits. To support this position, they point to the following quote from *Creed Taylor, Inc. v. CBS, Inc.,* 718 F.Supp. 1171 (S.D.N.Y. 1989):

> Issues decided upon a motion for summary judgment may be accorded the same preclusive effect as issues decided following a trial. . . . It would be strange indeed if a summary judgment could not have collateral estoppel effect. This would reduce the utility of this modern device to zero.

*Creed Taylor*, 718 F.Supp. at 1177.

    The Anniston defendants argue that, in the original action, Cooley knew there were other unnamed Anniston officers at the scene and was given their identities and their version of the relevant events. Despite this, the defendants contend, Cooley did not use discovery to investigate the unnamed officers potential liability or that of their supervisors. Further, they maintain, Cooley could have asked this court for more time for discovery if it were needed and/or for leave to amend his Complaint to add new parties or theories of recovery. Instead, the Anniston

defendants assert, Cooley sidestepped this court and filed a repetitive suit.  For all of these

reasons, the Anniston defendants argue, Cooley had a full and fair opportunity to litigate the

issues presented in the second Complaint in his original action.  According to the defendants, the

current situation can be summarized as follows:

> [Plaintiff's] filing of a lawsuit in this court "amounts to no more than a wish that, in applying the objective criteria to the undisputed facts, a different judge would make [a different]  . . . determination."  The doctrine of collateral estoppel, however, does not allow a party to take two bites at the same apple. [Plaintiff] chose the initial forum, lost . . . and is now precluded from relitigating [those issues] here. For this reason, plaintiff's complaint is due to be dismissed.

*Chazen v. Deloitte & Touche, LLP,* 247 F.Supp.2d 1259, 1264 (N.D. Ala. 2003) (internal citation

omitted), *aff'd in part, rev'd in part,* 2003 WL 22994232 (11th Cir.2003).

### C.     Prior Pending Action Doctrine.

The Anniston defendants assert that, in addition to the doctrines of res judicata and

collateral estoppel, the "prior pending action doctrine" also supports their contention that they are

entitled to judgment as a matter of law.  According to the defendants, "[a]s part of its general

power to administer its docket, a district court may stay or dismiss a suit that is duplicative of

another federal court suit."  *Curtis v. Citibank, N.A.,* 226 F.3d 133, 138 (2nd Cir. 2000) (quoting

*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).  *See also*

*Adam v. Jacobs,* 950 F.2d 89, 92 (2nd Cir. 1991) (stating that where there are two competing

lawsuits, the first suit should usually have priority); *Walton v. Eaton Corp.,* 563 F.2d 66, 70 (3rd

Cir. 1977) (en banc) (stating that it was clear that plaintiff had no right to maintain two separate

actions involving the same subject matter at the same time in the same court and against the same

defendant).  The Anniston defendants maintain that the Eleventh Circuit has embraced the prior

23

pending action doctrine.  *See I.A. Durbin, Inc. v. Jefferson Nat. Bank,* 793 F.2d 1541, 1551 (11th Cir. 1986) (stating, "[i]t is well established that as between federal district courts, ... the general principle is to avoid duplicative litigation" (internal quotation marks omitted)).  They assert that the doctrine "rest[s] on considerations of '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'"  *I.A. Durbin, Inc.,* 793 F.2d at 1551 (quoting *Colorado River,* 424 U.S. at 817).  The U.S. Supreme Court has stated:

> [A] party seeking to enforce a claim legally or equitably must present to the court, either in pleading or in proof, or both, all the grounds upon which he expects a judgment in his favor. He is not at liberty to split up his demand, and prosecute it by piecemeal, or present only a portion of the grounds upon which special relief is sought, and leave the rest to be presented in a second suit, if the first fail. There would be no end to litigation if such a practice were permissible.

*U.S. v. Haytian Republic,* 154 U.S. 118, 125 (1894) (internal quotation marks omitted).[4]  The Anniston defendants further note that the First Circuit has stated that "[t]here is no reason why a court should be bothered or a litigant harassed with duplicating lawsuits on the same docket; it is enough if one complete adjudication of the controversy be had."  *Sutcliffe Storage & Warehouse Co. v. U.S.,* 162 F.2d 849, 851 (1st Cir. 1947).

The Eleventh Circuit has stated that, "the general rule is that a suit is duplicative of

---

[4] In *Haytian Republic,* the Court also stated that the above quoted principle must be qualified as follows:

> But this principle does not require distinct causes of action--that is to say, distinct matters, each of which would authorize by itself independent relief--to be presented in a single suit, though they existed at the same time, and might be considered together.

154 U.S. at 125.

another suit if the parties, issues and available relief do not significantly differ between the two

actions." *I.A. Durbin, Inc.*, 793 F.2d at 1551.  The Anniston defendants argue that the Eleventh

Circuit has held that a second suit will be barred if the claim involves the same parties or their

privies and "arises out of the same transaction or series of transactions" as the first claim.

*Trustmark Ins. Co. v. ESLU, Inc.,* 299 F.3d 1265, 1269-70 (11th Cir. 2002).  To further support

their position, the Anniston defendants highlight  the following quote from *Oxbow Energy, Inc.*

*v. Koch Industries, Inc.,* 686 F.Supp. 278 (D. Kan. 1988):

> A nonparty whose interests were adequately represented in a previous action will
> be bound by that prior action.  The same principle applies in the case of a party
> adequately represented in a prior action attempting to split the cause of action and
> file a second suit. A party is in privity if a person is so identified in interest with a
> party to former litigation that he represents precisely the same right in respect to
> the subject matter involved.

686 F.Supp. at 283 (internal citations and quotation marks omitted).  According to the Anniston

defendants, the court must "assess whether the second suit raises issues that should have been

brought in the first." *Curtis v. Citibank, N.A.,* 226 F.3d 133, 140 (2nd Cir. 2000).  The

defendants maintain that, in determining whether a claim is barred by the prior pending action

doctrine, the court may rely on a comparison of the pleadings filed in the two actions.  *See*

*Connecticut Fund For Environment v. Contract Plating Co., Inc.*, 631 F.Supp. 1291, 1293 (D.

Conn. 1986) (discussing preclusion effect of prior suit against defendant and stating that, in most

cases, a court may rely primarily on a comparison of the pleadings filed in the two actions).

It is the Anniston defendants' position that the prior pending action doctrine applies

because the claims brought in the second suit should have been brought in the first suit.  The

defendants argue that trial courts are afforded broad discretion in fashioning remedies in order to

avoid duplicating a proceeding already pending in another federal court. *I.A. Durbin, Inc.*, 793 F.2d at 1551-52.  Decisions based on such discretion, they assert, can only be reversed upon a finding of abuse. *See Adam v. Jacobs,* 950 F.2d 89, 92 (2nd Cir. 1991) (discussing bounds of courts discretion).  According to the Anniston defendants, "[t]he complex problems that can arise from multiple federal filings do not lend themselves to a rigid test, but require instead that the district court consider the equities of the situation when exercising its discretion." *Curtis v. Citibank, N.A.,* 226 F.3d 133, 138 (2nd Cir. 2000).  The defendants maintain that the general rule is that the first suit to be filed should have priority "absent the showing of balance of convenience in favor of the second action." *Adam,* 950 F.2d at 93-94.

The Anniston defendants point out that, "[b]ecause of the obvious difficulties of anticipating the claim or issue-preclusion effects of a case that is still pending, a court faced with a duplicative suit will commonly stay the second suit, dismiss it without prejudice, enjoin the parties from proceeding with it, or consolidate the two actions." *Curtis*, 226 F.3d at 138.  However, the defendants contend, a court may outright dismiss the second suit with prejudice, because "plaintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the same time." *Id.* at 138-39.  According to the Anniston defendants, the power to dismiss a duplicative lawsuit is meant to (1) foster judicial economy, (2) foster the "comprehensive disposition of litigation," and (3) protect parties from "the vexation of concurrent litigation over the same subject matter." *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.,* 342 U.S. 180, 183 (1952); *Adam*, 950 F.2d at 93.

The Anniston defendants assert that, here, the court should dismiss the claims against them with prejudice.  According to the defendants, to do anything else would permit Cooley to

bypass this court's scheduling orders and management of the case.  They assert that, "the district court must ensure that the plaintiff does not use the incorrect procedure of filing duplicative complaints to expand the procedural rights he would otherwise enjoy--particularly for the purpose of circumventing the rules pertaining to the amendment of complaints."  *Oliney v. Gardner*, 771 F.2d 856, 859 (5th Cir. 1985) (citing *Walton v. Eaton Corp.*, 563 F.2d 66, 71 (3d Cir. 1977)).  The Anniston defendants argue that Cooley's attorneys knew or should have known that they could have joined the party defendants and claims brought in the second suit with the original case.

### D.     Plaintiff Cannot Produce Substantial Evidence to Support His Claims in Case Number CV-04-PT-2588-E.

The Anniston defendants contend that, even if the court does not enter summary judgment in their favor for the reasons discussed above, summary judgment is still proper on many of the claims asserted in the second case because there is a lack of proof.  According to the defendants, all of Cooley's claims are brought pursuant to 42 U.S.C. § 1983, which provides a remedy against any person who, acting under color of law, deprives another of rights protected by the U.S. Constitution.  The defendants assert that "§ 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (citation omitted).

### 1.     Count One – Claims Against Chief Dryden.

According to the Anniston defendants, Count One alleges that Dryden is liable to Cooley under § 1983 for improperly training the Anniston officers on the issues of proper force, arrest, and prosecution.  The defendants contend that Dryden is entitled to summary judgment on this

27

claim because: (1) there is no evidence of supervisory liability; and (2) Dryden is immune as a matter of law.

The Anniston defendants assert that "[t]he standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Cottone v. Jenne,* 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation marks and citation omitted). According to the defendants, a supervisor cannot be liable "for the unconstitutional acts of [his] subordinates on the basis of respondeat superior or vicarious liability." *Id.* (internal quotation marks and citation omitted). Instead, they argue, supervisor liability is only permissible under § 1983 when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation. *Id.* The Anniston defendants maintain that the necessary causal connection can only be established: (1) when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so; (2) when a supervisor's custom or policy results in deliberate indifference to constitutional rights; (3) when the facts support an inference that the supervisor directed the subordinates to act unlawfully; or (4) when facts support an inference that the supervisor knew that the subordinates would act unlawfully and failed to stop them from doing so. *Id.*

The Anniston defendants state that Cooley cannot produce evidence of any of these things in this case. First, they argue, there is no evidence of a history of excessive force use among Anniston officers to put Dryden on notice of a need for corrective action. Second, the defendants assert, Cooley cannot identify a "policy" or "custom" that caused his injury. *See Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir. 1998) (stating, "a municipality may be held liable for the actions of a police officer only when municipal 'official policy' causes a constitutional

28

violation"). The Anniston defendants contend that the police departments written policies on force, discussed above, are constitutional. They acknowledge that an informal "custom" may constitute a policy even though it is in direct contradiction with the formal policy. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 659 (1978) (finding that local governments may be sued for "constitutional deprivations visited pursuant to governmental 'custom' even though such custom has not received formal approval through the government's official decision-making channels"). However, the defendants assert, if Cooley wishes to rely on such an informal policy, he must produce evidence of: (1) "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law," *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (internal quotation marks and citation omitted); and (2) actual or constructive knowledge of the unconstitutional practice by Dryden. The Anniston defendants contend that Cooley can prove neither in this case. As a matter of law, the defendants argue, a single unconstitutional act, such as that alleged here, by a non-policy-making employee, is not a custom. *Monell*, 436 U.S. at 559. Further, the Anniston defendants assert, there is no evidence that Dryden directed any of the officers during the events in question here, much less that he directed them to act unlawfully. Nor, they maintain, is there any evidence that Dryden knew the Anniston officers would allegedly act unlawfully. Because none of the avenues of supervisor liability are present, the Anniston defendants conclude, Dryden did not violate Cooley's constitutional rights.

Even if Cooley could produce evidence that Dryden technically violated his constitutional rights, the Anniston defendants assert, Dryden would nevertheless be entitled to federal qualified

immunity.  The defendants highlight the following passage from *Marsh v. Butler County, Ala.*,

268 F.3d 1014 (11th Cir. 2001):

> A government-officer defendant is entitled to qualified immunity unless, at the time of the incident, the "preexisting law dictates, that is, truly compel[s]," the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiffs' federal rights in the circumstances.
>
> When looking at the preexisting case law, courts, dealing with qualified immunity defenses, must always keep in mind the great distinction between following a precedent and extending a precedent. Two sets of circumstances may be "nearly" the same, but "nearly" can make a great legal difference at the edge. Because fair and clear notice to government officials is the cornerstone of qualified immunity, courts must diligently analyze the preexisting case law to determine whether it really did provide plain notice to every reasonable government official that the pertinent conduct, in the specific circumstances, would clearly violate preexisting federal law.
>
> When the facts of previous precedents are necessary to give clear warning that certain conduct in specific circumstances will violate federal law, we must look at the facts in the precedent and at the facts that confronted the government official in the case before the court. The two sets of facts must be materially similar. For qualified immunity purposes, a preexisting precedent is materially similar to the circumstances facing an official when the specific circumstances facing the official are enough like the facts in the precedent that no reasonable, similarly-situated official could believe that the factual differences between the precedent and the circumstances facing the official might make a difference to the conclusion about whether the official's conduct was lawful or unlawful, in the light of the precedent. Thus, every fact need not be identical. But minor variations in some facts (the precedent lacks an arguably significant fact or contains an additional arguably significant fact not in the circumstances now facing the official) might be very important and, therefore, be able to make the circumstances facing an official materially different from the preexisting precedents, leaving the law applicable--in the circumstances facing the official--not clearly established when the defendant official acted.
>
> To apply properly this "materially similar" principle, the court, surveying the relevant area of law, must discern the facts that were material to the federal law violation in similar preexisting cases.  These facts then must be compared to the facts alleged in the case before the court. If there is an absence of a fact (or the presence of an additional fact) in the case before the court, the court must determine whether that fact might make a difference to any reasonable official

30

who had to determine whether his conduct violated federal law in the circumstances in the immediate case. If the court determines that the variance might make a difference, the precedent--when factual particularity is needed to establish the law--cannot clearly establish the law applicable to the circumstances facing the defendant.

268 F.3d at 1031-33 (footnotes and citations omitted).

Here, the Anniston Defendants argue, there was no case from the Alabama Supreme Court, the U.S. Supreme Court, or the Eleventh Circuit Court of Appeals on August 22, 2002 that established that the actions of Dryden were in violation of the constitution. Therefore, the defendants conclude, Dryden is immune as a matter of law.

## 2.      Count Two – Claims Against Smith.

Interestingly, the Anniston defendants note, under Court Two, Cooley does not claim that Smith should be held liable under § 1983 for excessive force. Instead, they assert, Count Two merely alleges that Smith is liable under § 1983 for conspiring with Battles to deprive Cooley of "equal protection of the laws and equal privileges and immunities." According to the Anniston defendants, this claim fails because: (1) there is no underlying equal protection constitutional deprivation; and (2) there is no evidence of a conspiracy.

The Anniston defendants note that section 1 of the Fourteenth Amendment states that no state shall "deny to any person within its jurisdiction the equal protection of the laws." The defendants maintain that the equal protection clause only requires that the government treat similarly situated persons in a similar manner. *City of Cleburne, Texas v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985). When the government actors classify persons in such a way that they receive different treatment under the law, the defendants contend, the degree of scrutiny the court applies depends upon the basis for the classification. *See Joel v. City of*

31

*Orlando,* 232 F.3d 1353, 1357 (11th Cir. 2000) (discussing equal protection rational basis test).

The defendants contend that the Complaint does not specify on what basis Cooley believes he, as

a member of a class, has been denied equal protection of the laws.  However, they argue, even if

Cooly had properly plead this claim, it is clear that he cannot produce evidence to support it.  The

Anniston defendants assert that, to establish a violation of the equal protection clause, Cooley

must first establish that he was treated differently by them because he belongs to a certain class.

*Cruz v. Skelton,* 543 F.2d 86, 92 (5th Cir. 1976) (discussing plaintiff who did not base

discrimination claim on "race, religion, national origin, or poverty").  Second, the defendants

argue, Cooley must establish that they engaged in invidious discrimination against him because

of that class.  To meet this requirement, the defendants note, Cooley must prove that (1) their

actions had a discriminatory effect on him; and (2) they were motivated to act by a discriminatory

purpose.  *United States v. Armstrong,* 517 U.S. 456, 465 (1996).  To prove discriminatory effect,

they argue, Cooley must show that: (1) he was a member of a protected class; (2) he was

otherwise similarly situated to members of the unprotected class; and (3) he was treated

differently from members of the unprotected class.  *Chavez v. Illinois State Police,* 251 F.3d 612,

636 (7th Cir. 2001).  Here, the Anniston defendants argue, Cooley has not identified similarly

situated members of the unprotected class who were treated differently.  Nor, they continue, has

Cooley proven that he was unfairly singled out.  Further, the defendants maintain, Cooly cannot

prove discriminatory purpose.  According to the Anniston defendants, to prove discriminatory

purpose, Cooley must demonstrate that they acted or reaffirmed a particular course of action that

had, at least in part, adverse effects upon a protected group.  *Chavez v. Illinois State Police,* 251

F.3d 612, 645 (7th Cir. 2001) (quoting *McCleskey v. Kemp,* 481 U.S. 279, 292 (1987)).  The

Anniston defendants contend that the law on discriminatory intent requires tangible proof of actions which were adverse to the protected party. *See Chavez,* 251 F.3d at 645 (discussing evidence of discriminatory purpose). The defendants maintain that there is no such evidence in this case. *See Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115-16 (11th Cir. 1993) (stating that, regarding issues on which the non-moving party bears the burden of proof, the party moving for summary judgment may prevail by simply pointing out the lack of evidence to the district court).

Second, the defendants argue, even if someone did violate Cooley's constitutional right to equal protection, there is no evidence of a conspiracy to do so, much less that Smith was involved in it. The Anniston defendants assume that plaintiff meant to assert his conspiracy claim under § 1985(3).[5] To succeed with a § 1985(3) conspiracy claim, the defendants note, Cooley must show: (1) the existence of a conspiracy; (2) that is intended to deny equal protection under the laws or equal privileges and immunities of the laws to persons in Cooley's class; (3) resulting in an injury or deprivation of a federally protected right; and (4) an overt act in furtherance of the object of the conspiracy. *Murray v. City of Sapulpa,* 45 F.3d 1417, 1423 (10th Cir. 1995) (citing *Griffin v. Breckenridge,* 403 U.S. 88, 102-03 (1971)). Here, the defendants

---

[5] Section 1985(3) states in part:

> If two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws . . . if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C.A. § 1985(3).

argue, there is no proof of a conspiracy, much less one intended to deny equal protection under the laws or equal privileges and immunities of the laws.  Nor, they argue, is there proof of any overt act in furtherance of the object of such a conspiracy.  Furthermore, the Anniston defendants contend, to succeed on a § 1985(3) conspiracy claim, there must be evidence of an underlying constitutional deprivation.  *Nieves v. McSweeney*, 241 F.3d 46, 50 (1st Cir. 2001).  *See also Dixon v. City of Lawton, Okl.,* 898 F.2d 1443, 1449 n.6 (10th Cir. 1990) (stating, "[p]rovided that there is an underlying constitutional deprivation, the conspiracy claim allows for imputed liability").  As there is no evidence to support an equal protection constitutional violation, the defendants conclude, there can be no conspiracy to deprive Cooley of equal protection of the law.

### 3.    Count Three – Claims Against Dobbin.

The Anniston defendants note that, among them, only Dobbin is subject to the claims in Count Three.  According to the defendants, Count Three alleges that Dobbin is liable under § 1983 for: (1) conspiring with Smith and Battles; and (2) failing to stop Smith and Battles' alleged excessive force.  The Anniston defendants acknowledge that Cooley's testimony precludes summary judgment on the part of this claim that seeks to hold Dobbin liable for failing to stop Smith and Battles' alleged use of excessive force.  However, the defends assert, Cooley cannot produce any evidence of a conspiracy between Battles, Smith, and Dobbin.  Therefore, they conclude, Dobbin is entitled to summary judgment on that aspect of the claim.

### 4.    Count Four – Claims Against Garrison and McElroy.

The Anniston defendants point out that Count Four asserts claims against Garrison and McElroy that are identical to those asserted against Dobbin in Count Three.  However, the defendants contend, Garrison and McElroy are entitled to summary judgment on both aspects of

Cooley's claim that they: (1) conspired with Smith and Battles; and (2) failed to stop Smith and Battles' alleged use of excessive force.

First, the defendants maintain, there is no evidence of a conspiracy. Second, they assert, the facts show that Garrison and McElroy did not violate Cooley's constitutional rights as "standby officers" because they could not know that Battles and Smith were allegedly using excessive force. The Anniston defendants note that the "[u]se of force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)). Further, the defendants state, "'[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.'" *Jackson v. Sauls,* 206 F.3d 1156, 1170 (11th Cir. 2000) (quoting *Graham*, 490 U.S. at 396-97). According to defendants, "[t]he question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Jackson,* 206 F.3d at 1170 (internal quotation marks omitted) (citing *Graham*, 490 U.S. at 397). The Anniston defendants acknowledge that the Eleventh Circuit has held that "'an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.'" *Riley v. Newton,* 94 F.3d 632, 635 (11th Cir. 1996) (quoting *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442 (11th Cir.1995)). However, they argue, when the officer is not present during the events leading up to the excessive force and otherwise has no knowledge of the amount of force

35

required by the circumstances, the officer is not constitutionally liable just because he witnesses the other officer struggling with and/or using force on the plaintiff.

The defendants draw the court's attention to *Riley v. Newton,* 94 F.3d 632 (11th Cir. 1996). In *Riley*, officers Glisson and Newton gave chase to a truck, containing two occupants who had fled from the scene of a traffic stop. 94 F.3d at 635. When the truck finally stopped, the driver, Green, did not turn off the ignition or exit the vehicle on command. *Id.* Glisson reached in the driver's side, pulled Green out, put him on the ground, and cuffed him. *Id.* Glisson then returned to his car to turn off the siren and call for a transport unit. *Id.* As he passed the window on the truck, Glisson observed that Newton had straddled the passenger, Low, on the ground while attempting to handcuff him. *Id.* Glisson saw that the two were struggling and that one of Lowe's hands was handcuffed while the other was free. *Id.* As Glisson moved toward the patrol car, he heard Newton's gun fire, wounding and killing Lowe. *Id.*

The Anniston defendants note that the Eleventh Circuit held that Glisson was not liable as a matter of law for Newton's use of excessive force against Lowe. *Id.* The court stated:

> Plaintiffs have come forward with no facts from which a jury could find that Glisson failed to take reasonable steps to protect Lowe from excessive force. The undisputed facts establish that Glisson was engaged in making the arrest of Green while Newton, on his own, was dealing with Lowe. They were on opposite sides of the truck. When he saw Newton struggling with Lowe, Glisson observed no use of excessive force which might have given rise to a duty to intervene to stop it, nor did he have an indication of the prospective use of excessive force--none occurred until Newton's weapon fired. Because Glisson had no reason to expect the use of excessive force until after it had occurred, he had no reasonable opportunity to protect Lowe, and the obligation to take steps to protect him never arose.

*Id.*

The Anniston defendants also highlight *Ensley v. Soper,* 142 F.3d 1402 (11th Cir. 1998),

in which the Eleventh Circuit cited *Riley* and held:

> [T]his is not a case in which an officer is alleged to have stood idly by while a fellow officer mistreated a member of the public. Rather, all of the abuse allegedly suffered by Ralph occurred while Johnston was attempting to restrain and arrest Wesley. Without some precedent holding that an officer has a duty to abandon his attempt to arrest one armed attacker in order to protect another armed attacker against whom other officers may be using excessive force, Johnston had discretion to decide whether Wesley or the officers arresting Ralph deserved his immediate attention. *See Riley*, 94 F.3d at 635 (holding that an officer who was engaged in arresting a suspect, and who did not observe his fellow officer's use of excessive force on a second suspect, did not have a duty to intervene).

> Further, in order for an officer to be liable for failing to stop police brutality, the officer must be "in a position to intervene." *Id.*; *see also Thompson v. Boggs*, 33 F.3d 847, 857 (7th Cir.1994). At oral argument, we requested that the Ensleys provide us with a supplemental brief listing all of the evidence in the record that might lead a reasonable juror to believe that Johnston had an opportunity to observe or halt any excessive force directed at Ralph. After thoroughly examining the Ensleys' submission, we see no evidence in the record that might show that Johnston observed his fellow officers' alleged abuse of Ralph or that he had opportunity to intervene. As all the parties agree, Johnston and the two other officers who together arrested Wesley observed the initial altercation between Ralph and officer Doyle. Once Wesley joined the fray, however, Johnston became actively involved in the arrest of Wesley; Johnston therefore claims that he did not observe any use of excessive force against Ralph. In fact, even Wesley concedes that he did not see any abuse, see R8-62 Exh. L at 20; since Johnston was with Wesley, Wesley's testimony corroborates Johnston's claim that he was not in a position to know Ralph's circumstances. Against this evidence, the Ensleys offer nothing that might show that Johnston could have observed or did observe excessive force. Finally, Johnston had little choice but to remain with Wesley while he and his fellow officers brought Wesley under control and secured him in Johnston's vehicle. Under these circumstances, we believe that no reasonable juror could find that Johnston was "in a position to intervene." Therefore, even if the district court is correct that "a reasonable person could conclude that ... [Johnston's fellow officers] used excessive force," we see no evidence that might lead a reasonable juror to conclude that Johnston violated any clearly established right of Ralph to intervention. Again, Johnston is entitled to qualified immunity and thus summary judgment on the Ensleys' claim regarding Johnston's alleged failure to intervene.

142 F.3d at 1407-08 (footnote omitted). *See also Carr v. Tatangelo,* 338 F.3d 1259, 1270 n.21

(11th Cir. 2003) (finding qualified immunity when the officer was across the street from the events leading up to the alleged excessive force and was unaware of the rapidly developing situation); *Martin v. Anderson*, 107 F.Supp.2d 1342, 1350 (M.D. Ala. 1999) (finding "stand-by" officers were not liable when offending officer kicked plaintiff in the head once, not in the presence of the officers).

According to the Anniston defendants, the above cited cases show that, unless there is evidence that the standby officer had reason to know the offending officer was using excessive force, he does not violate a suspect's constitutional rights by not intervening to stop the force. Here, the defendants contend, the facts show that Garrison and McElroy arrived only during the final stages of the struggle to handcuff Cooley. They point out that Cooley admitted to struggling during his deposition. Under these circumstances, the Anniston defendants argue, no reasonable juror could believe that Garrison or McElroy should have known that Smith or Battles was using excessive force.

Third, the Anniston defendants continue, even assuming Garrison and McElroy technically violated Cooley's constitutional rights, they are entitled to qualified immunity as a matter of law. The defendants maintain that, as of August 22, 2002, there was no case from the Alabama Supreme Court, the U.S. Supreme Court, or the Eleventh Circuit Court of Appeals which would have made Garrison and McElroy's actions constitutional violations.

### 5. Count Five – Claims Against Dryden, Dobbin, Garrison, McElroy and Smith.

The Anniston defendants note that Count Five asserts that they are liable under § 1983 for conspiring with Battles to maliciously prosecute Cooley. According to the defendants, they are

entitled to summary judgment on this count for a number of reasons.

First, they argue, even if Cooley could prove that he suffered a malicious prosecution, he cannot establish a causal connection between such prosecution and the actions of the Anniston defendants because the Anniston defendants did not control the prosecution.  According to the defendants, the Eleventh Circuit has held that police officers who merely provide information to the prosecuting attorney are relieved from liability on a malicious prosecution claim:

> Recovery of damages is limited to those injuries proved to be caused by the defendants. This lawsuit is against arresting officers. In many cases, arresting officers will not be responsible for the continuation of the prosecution because the prosecutor (or some other factor) will break the causal link between defendants' conduct and plaintiff's injury.

*Whiting v. Traylor*, 85 F.3d 581, 586 n.10 (11th Cir. 1996).  The Anniston defendants note that the *Whiting* court cited to *Eubanks v. Gerwen*, 40 F.3d 1157, 1160-61 (11th Cir.1994) , where the court held that arresting officers were entitled to summary judgment on a § 1983 malicious prosecution claim when the evidence in the record showed that none of the defendants had anything to do with the decision whether or not to prosecute the plaintiff.

Second, the defendants assert, even if Cooley could prove that they had an involvement in his prosecution, there is no evidence that his constitutional rights were violated.  In the Eleventh Circuit, the defendants note, to establish a federal malicious prosecution claim under § 1983, a plaintiff must prove: (1) the elements of the common law tort of malicious prosecution in the State where the prosecution was brought; and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures.  *Kingsland v. City of Miami*, 382 F.3d 1220, 1235 (11th Cir. 2004) (citing *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003), *cert. denied*, 540 U.S. 879 (2003)).  Even assuming that Cooley could prove the common law elements of malicious

prosecution, the defendants maintain, he cannot bear his burden of proving that he suffered a Fourth Amendment seizure in relation to the prosecution.  In cases of warrantless arrests, the Anniston defendants point out, the Eleventh Circuit has held that the prosecution does not begin until the party is arraigned or indicted.  *Kingsland*, 382 F.3d at 1235.  Further, the defendants assert, a plaintiff's arrest "cannot serve as the predicate deprivation of liberty because it occurred prior to the time of arraignment, and was not one that arose from malicious prosecution as opposed to false arrest." *Id.*  (internal quotation mark and citation omitted).  The Anniston defendants highlight the facts of *Kingsland v. City of Miami*, 382 F.3d 1220, 1235 (11th Cir. 2004).  The defendants note that, like Cooley, the plaintiff in *Kingsland* was arrested, jailed, and released on bond.  382 F.3d at 1225.  The court held that, because she was released, she did not suffer a deprivation of liberty or a seizure in violation of the Fourth Amendment during the prosecution.  *Id.* at 1236.  Because the facts of this case are identical to those in *Kingsland*, the Anniston defendants argue, this court should enter summary judgment in their favor on the § 1983 malicious prosecution claims.

Third, the Anniston defendants contend, they are entitled to summary judgment on the conspiracy aspect of this claim because there is no evidence of a conspiracy and no evidence of an underlying constitutional deprivation.

Fourth, they argue, Cooley's own testimony only implicates Smith and possibly Dobbin in any wrongdoing.  According to the defendants, there is no evidence that Garrison, McElroy, or Dryden knew that any unconstitutional conduct took place.  As such, they argue, those defendants could not have acted with malice, a required element of malicious prosecution. *Kingsland*, 382 F.3d at 1234-1235 (citing the elements of malicious prosecution under Florida

law).

Similarly, the defendants state, even if Garrison, McElroy, or Dryden technically violated Cooley's constitutional rights by participating in the alleged malicious prosecution, they are entitled to qualified immunity because, at the relevant time, there was no case from the Alabama Supreme Court, the U.S. Supreme Court, or the Eleventh Circuit that would indicate their actions were unconstitutional.

## II.    Plaintiff's Response.

Cooley did not respond to the Anniston defendants' motion.

## III.   Defendant Battles' Motion.

### A.    Qualified Immunity on the Excessive Force Claim in Case Number CV-03-PT-2502-E.

Battles maintains that he is entitled to qualified immunity on Cooley's claim of excessive force in Case number CV-03-PT-2502-E.  Battles maintains that arresting Cooley was a discretionary function of the law enforcement officers involved.  *See Wood v. Kesler*, 323 F.3d 872, 883-84 (11th Cir. 2003)(stating, "[d]iscretionary acts are those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances" (internal quotation marks omitted)); *Scarborough v. Myles*, 245 F.3d 1299, 1303 n. 9 (11th Cir. 2001) (discussing discretionary-function immunity and qualified immunity). Regarding qualified immunity, the Eleventh Circuit has held:

> "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73

41

> L.Ed.2d 396 (1982). This defense "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). "[Q]ualified immunity operates 'to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.' " *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 206, 121 S.Ct. 2151, 2158, 150 L.Ed.2d 272 (2001)).

*See Carr v. Tatangelo*, 338 F.3d 1259, 1266 (11th Cir. 2003) (footnote omitted).  Additionally,

Battles points to the following discussion of qualified immunity from *Hendon v. City of*

*Piedmont*, 163 F.Supp. 2d 1316 (N.D. Ala. 2001):

> The Supreme Court has . . . determined that the assessment of whether a public official is entitled to qualified immunity is a two-step inquiry. First, the trial court must determine whether a constitutional right has been violated on the facts alleged. *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 2155 (2001). The court must assess the facts in a light most favorable to the party asserting the injury. *Id*. at 2156. Second, if a violation has been established, the court must determine whether the right was "clearly established." *Id*. This inquiry is to be made in light of the "specific context of the case" and not as a "broad general proposition." *Id.* The Supreme Court requires " 'that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Id*. (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The dispositive inquiry in determining whether the right is clearly established is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. (citing *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).

163 F.Supp. 2d at 1322.  According to Battles, in *Hope v. Pelzer,* 536 U.S. 730 (2002), the

Supreme Court found that the "clearly established" prong of the qualified immunity analysis asks

"whether the state of the law" in 2002 gave Battles "fair warning" that his alleged actions in the

course of arresting Cooley were unconstitutional.  536 U.S. at 741.

> **1.     Battles Did Not Use Excessive Force Against Plaintiff, and Did Not Violate Plaintiff's Constitutional Rights.**

Battles highlights the following passage from *Hendon*:

When addressing "excessive force" cases, the first inquiry for the court, whether a constitutional right has been violated, is guided by the mandates established in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). When an excessive force claim arises in the context of an arrest or investigatory stop, it is to be "characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons ... against unreasonable ... seizures' of the person." *Id.* at 394, 109 S.Ct. 1865. The court is to apply the Fourth Amendment's "objective reasonableness" standard which requires a "careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 395-96, 109 S.Ct. 1865 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). The question the court must answer is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397, 109 S.Ct. 1865. The Supreme Court's Fourth Amendment jurisprudence has recognized that the "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396, 109 S.Ct. 1865. Consequently, the proper application of the "objective reasonableness" test requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Furthermore, the reasonableness of the force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The court must allow for the fact that "police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving...." *Id.* at 397, 109 S.Ct. 1865.

The Eleventh Circuit has provided further guidance for this inquiry. The Eleventh Circuit has stated that "[q]ualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Nolin v. Isbell*, 207 F.3d 1253, 1255 (11th Cir.2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). When determining whether an officer's use of force was objectively reasonable, a court should consider "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically." *Moore v. Gwinnett County*, 967 F.2d 1495, 1498 (11th Cir.1992) (quoting *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th

Cir.1986)). The Eleventh Circuit has explained that in excessive force cases, "qualified immunity applies unless application of the standard would inevitably lead every reasonable officer ... to conclude the force was unlawful." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir.1993). This standard of objective reasonableness which is used to assess an officer's entitlement to qualified immunity " 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.' " *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 (11th Cir.2000) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). Furthermore, the Eleventh Circuit has observed that it has "established the principle that the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin*, 207 F.3d at 1257.

163 F.Supp.2d at 1322-23.

Considering plaintiff's repeated refusal to stop his car even after Smith turned on the blue emergency lights, sounded his emergency siren, and pulled alongside (with Battles motioning and yelling for Cooley to stop), Battles argues, his actions were "objectively reasonable" under *Graham v. Carter*. To make matters worse, Battles contends, Cooley actively resisted arrest once his vehicle was stopped, and the officers told him he was under arrest. Battles argues that he and Smith had no way of knowing if Cooley was carrying a gun or a knife, and had only seconds to decide how to protect themselves and make the arrest safely.

Battles draws the court's attention to *Smith v. City of Chicago*, 242 F.3d 737 (7th Cir. 2001), where the court affirmed a district court's grant of summary judgment to defendant law enforcement officers who faced an excessive force claim after making a traffic stop in an unmarked vehicle. The *Smith* court stated:

> Smith asserts that he did not commit a traffic violation, he did not know that the men following him were police officers, and he did not hear the siren. However, these factual disputes are of no matter because under this standard we consider what happened from an officer's point of view and assess its reasonableness objectively. The officers' actions in this case were objectively reasonable. From the officers' vantage point, Smith committed a traffic violation, whereupon they

44

followed him and played their siren (confirmed by the tape) to signal him to pull over, which Smith did not do for twelve blocks. When Smith was finally stopped by marked police cars, the officers pulled Smith out of the car, pinned his arms behind his back, slammed him against the hood of his car, and handcuffed him. <u>A reasonable officer would have thought that Smith was trying to flee, thereby justifying the use of a higher degree of force to protect the community and the officers than that needed for someone who committed only a minor traffic violation. However, the officers' use of force here was not high, let alone excessive. The factual disputes raised by Smith are not material to his substantive excessive force claim as they rest upon his view of the incident.</u> Not all factual disputes warrant the denial of summary judgment; only disputes as to facts material to the substantive claim require resolution by trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1985). Since any factual disputes are not material to the substantive claim, we affirm the district court's grant of summary judgment on this claim.

242 F.3d at 743-44 (emphasis added).[6]  Similarly, Battles contends, a reasonable officer following Cooley for 14-blocks  through Anniston would have thought he was trying to flee, thus justifying a higher degree of force than that needed for an ordinary minor traffic violation.[7] According to Battles, Cooley compounded his behavior by then resisting arrest and again behaving as if he intended to flee on foot.

The lateral vascular neck restraint ("LVNR") technique, Battles contends, was used on Cooley to avoid striking blows.  That technique was described in *State v. Harris,* 505 N.W.2d 724 (Neb. 1993), as follows:

---

[6] Battles argues that the force used on Cooley was less than that used by the defendants in *Smith*, who slammed the plaintiff against the hood of the car.

[7] Incidentally, Battles argues, Cooley's failure to stop a vehicle when ordered to do so violated § 32-5A-193(a) of the Alabama Code, which provides:

> Any driver of a motor vehicle who willfully fails or refuses to bring his vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police vehicle, when given a visual or audible signal to bring the vehicle to a stop, shall be guilty of a misdemeanor. The signal given by the police officer may be by hand, voice, emergency light or siren.

> a self-defense technique used by police officers to gain compliance from suspects. To execute the restraint, an officer places his arm around the suspect's neck from behind the suspect and applies pressure to the sides of the suspect's neck. In this way, the officer keeps the V of his elbow at the front of the suspect's throat, protecting the suspect's larynx and Adam's apple from injury.

505 N.W.2d at 728 (affirming reasonableness of using LVNR to prevent suspect from

swallowing drugs).    Another state appellate court, Battles argues, found that a "LVNR is not a

choke hold." *See Peterson v. State*, 2001 WL 789312 at * 1 n.1 (Tex. App. July 12, 2001).

Battles contends that, because Cooley was actively resisting arrest, had repeatedly refused to stop

his vehicle, appeared to be attempting to flee, and refused to obey verbal commands to stop

resisting, the use of the LVNR technique to restrain Cooley did not constitute excessive force.[8]

Additionally, Battles contends, Cooley's abrasions and scratches were minor injuries.

Under Cooley's version of events, Battles argues, those minor injuries are all that can be

attributed to him.  Cooley, Battles notes, testified that he merely swept his feet out from under

him during his arrest.  Battles acknowledges that Cooley has testified that the use of the LVNR

technique caused his alleged eye injuries.  However, Battles contends, Cooley is not a doctor and,

thus, is not competent to testify regarding medical causation issues.  *See* Fed. R. Evid. 701

(limiting lay opinion testimony to matters "not based on scientific, technical, or other specialized

knowledge").  Battles further argues that Cooley did not complain about his eye until a day after

his arrest.  According to Battles, having failed to disclose any expert testimony to support his

allegation that his arrest caused his alleged eye injury or that his alleged eye injury was more than

---

[8] Even if the LVNR technique could constitute excessive force, Battles argues, Cooley deposition testimony identified Smith, not Battles, as the one who used such force.  Battles contends that the court must accept Cooley's version of events for purposes of this Motion for Summary Judgment.

minor, Cooley cannot now attempt to make an issue of that injury.

Under these facts, Battles argues, the force used and the injuries sustained could be considered "de minimis." *See  Nolin v. Isbell*, 207 F.3d 1253, 1255 (11th Cir.2000) (grabbed plaintiff and shoved him a few feet against vehicle, pushed knee in back and head against van, and handcuffed him); *Gold v. City of Miami*, 121 F.3d 1442, 1444 (11th Cir.1997) (handcuffed too tightly and too long); *Jones v. City of Dothan*, 121 F.3d 1456, 1458 (11th Cir.1997) (slammed plaintiff against the wall, kicked his legs apart and required plaintiff to raise hands above head as officers carried out arrest); *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1556 (11th Cir.1993) (pushed plaintiff against wall while handcuffed), modified, 14 F.3d 583 (11th Cir.1994).[9]  Even if not *de minimis*, Battles adds, the use of a LVNA to restrain a suspect who has refused to stop his vehicle, who could be armed, who actively resists arrest, who attempts to flee, and who presents a danger to the arresting officers is not objectively unreasonable.

### 2.     It is Not Clearly Established That Defendant Battles Actions Constituted Excessive Force.

Moreover, Battles argues, because Battles did not violate Cooley's constitutional rights, it is unnecessary to reach the second inquiry – whether the right was "clearly established." According to Battles, the right to be free from the force used was not "clearly established" given the facts of this case.[10]  In particular, Battles argues, Cooley testified that he did not apply the

---

[9] These cases (finding the force applied *de minimis*) and the parenthetical summaries are taken from *Vinyard v. Wilson*, 311 F.3d 1340, 1348 n. 13 (11th Cir. 2002).

[10] "In this circuit, rights are 'clearly established' by decisions of the Supreme Court, this court, or the highest court of the state in which the case arose." *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003).

LVNR technique, but only swept Cooley's feet out from under him.  Furthermore, Battles contends, neither the Supreme Court, this court, nor the Supreme Court of Alabama has held that a LVNR constitutes excessive force in the context of restraining a suspect resisting arrest.  In fact, Battles asserts, the Eleventh Circuit determined that a "choke hold" used in the course of an arrest was not excessive force.  *See Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559-60 (11th Cir. 1993).  Additionally, Battles argues, given Cooley's active resistance, his attempts to flee, and the potential danger to the arresting officers, this case is distinguishable from those in which excessive force was found because force was applied after the arrestee had been handcuffed and no longer posed a threat.[11]

### B.  Claims Against Battles in Count Two in Case Number CV-04-PT-2588-E.

Battles maintains that he is entitled to summary judgment on Count Two in Case number CV-04-2588-E because: (1) that claim is due to be dismissed under the prior pending action doctrine; and (2) Cooley fails to state a valid equal protection claim.

In support of his argument that Count Two should be dismissed under the prior pending action doctrine, Battles adopts the arguments of the Anniston defendants concerning this issue.

---

[11] *See Vinyard*, 311 F.3d at 1348-49 (denying qualified immunity where officer stopped patrol car, grabbed arrestee with sufficient force to bruise her arm and breast, and used pepper spray on arrestee while arrestee was handcuffed, secured in back of patrol car, and posed no threat to officer or public); *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002) (denying qualified immunity where officer slammed arrestee's "head against the trunk [of patrol car] *after* she was arrested, handcuffed, and completely secured . . . ."); *Slicker v. Jackson*, 215 F.3d 1225, 1232-33 (11th Cir. 2000) (denying qualified immunity to officers who slammed arrestee's head into pavement "even though he was handcuffed and did not resist, attempt to flee, or struggle with officers in any way"); *Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000) (denying qualified immunity where officers let dog attack plaintiff where plaintiff immediately submitted to officers, did not attempt to resist or flee, and posed no threat to officers); and *Smith v. Mattox*, 127 F.3d 1416, 1420 (11th Cir. 1997) (denying qualified immunity to officer who broke the arm of unresisting arrestee).

In particular, Battles argues, to permit Cooley to "morph" his excessive force claim into some kind of equal protection claim would allow him to circumvent the scheduling order in case number CV-03-2502-E. *See Oliney v. Gardner,* 771 F.2d 856, 859 (5th Cir. 1985) (citing *Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir.1977), for the proposition that "appellant 'had no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant[s]'").  According to Battles, the only claim left standing after this court's March 10, 2004 Order was Cooley's excessive force claim.

Battles further adopts the arguments of the Anniston defendants that Cooley cannot produce substantial evidence to support his claims in Count Two.  Battles acknowledges that Cooley has an excessive force claim against him in the first action.  However, Battles maintains, Count Two nonetheless fails because: (1) there is no underlying equal protection constitutional deprivation; and (2) there is no evidence of a conspiracy.

### C.     Claims Against Battles in Count Five in Case Number CV-04-PT-2588-E.

Battles highlights Cooley's deposition testimony that his only complaints against Battles concerned his arrest, and not his later prosecution in municipal and state district court.  In addition to this testimony, Battles contends, the evidence establishes that he is not the proper defendant for Cooley's malicious prosecution claim.

Battles asserts that he is not a prosecutor, he did not file the municipal or district court cases against Cooley, and there is no evidence that he "improperly influenced the decision to prosecute" Cooley. *Eubanks v. Gerwen*, 40 F.3d 1157, 1161 (11th Cir. 1994).  Accordingly, Battles contends, he is not a proper target for Cooley's malicious prosecution claim. *See id.* at 1160-61 (finding police chief and officer not proper targets of malicious prosecution claim

49

where: neither were responsible for decision to prosecute; neither improperly influenced prosecution; and both fully apprized state attorney of all relevant information known to then that weighted in favor or against suspect's guilt).  Finally, Battles adopts the arguments of the Anniston defendants concerning Cooley's inability to prove his claims under Court Five.

**IV.   Plaintiff's Response.**

Cooley did not respond to Battles' motion.

**CONCLUSIONS OF THE COURT**

The plaintiff has not responded to the defendants' submissions.  In any event, it is apparent that many of plaintiff's claims are due to be dismissed for one or more reasons.  This court will not base its rulings on the defendants' arguments at pages 13-27 *supra*, although such arguments may have merit.  The more apparent deficiencies in plaintiff's claims, however, relate to the merits of the claims.  The court will address these deficiencies.[12]

Defendant Dryden

There is no evidence that Dryden participated in any alleged incident, nor that he was on notice of the need for any specific supervision or training.  There is no evidence of the circumstances listed as (1) – (4) on page 28 *supra*.  The motion will be granted as to Dryden.[13]

Defendant Smith

The court agrees that there is no substantial evidence to support an equal protection claim against Smith.  There are only conclusory, unsupported allegations.  Neither is there evidence of

---

[12] The court will dismiss the malicious prosecution claims against all the defendants for the reasons discussed at pages 38-41, *supra*.

[13] In any event, Dryden is entitled to qualified immunity.

a conspiracy to deny equal protection.  The court will deny the motion as to the alleged use of excessive force by Smith.  The court will dismiss all claims against Smith except the excessive force claim.

<u>Defendant Dobbin</u>

_____The Court will dismiss any claim(s) against Dobbin other than the alleged claim that Dobbin failed to stop Smith and Battles from using excessive force.

<u>Defendants Garrison and McElroy</u>

_____For the reasons argued at pages 34 – 38, the court will dismiss the claims against Garrison and McElroy.

<u>Defendant Battles</u>

The court will dismiss all claims against Battles except the excessive force claim.

This 8th of June, 2005.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**